DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of - | ) |
| | ) |
| Shoreline Foundation, Inc. | ) ASBCA Nos. 62876, 63616 |
| | ) |
| Under Contract No. W912EP-16-C-0027 | ) |

APPEARANCES FOR THE APPELLANT: Robert G. Barbour, Esq.
    Matthew D. Baker, Esq.
     Watt, Tieder, Hoffar & Fitzgerald, L.L.P.
     McLean, VA

APPEARANCES FOR THE GOVERNMENT: Michael P. Goodman, Esq.
     Engineer Chief Trial Attorney
    Amber R. Jackson, Esq.
    Kristin M. Bigham, Esq.
    Logan Grutchfield, Esq.
    Mischael Sachmorov, Esq.
     Engineer Trial Attorneys
     U.S. Army Engineer District, Jacksonville

OPINION BY ADMINISTRATIVE JUDGE O'CONNELL

These appeals arise from a contract for the construction of artificial reefs off the coast of Brevard County, Florida. In ASBCA No. 62876, appellant, Shoreline Foundation, Inc. (SFI), seeks $2,663,902, contending that the government wrongfully failed to disclose superior knowledge of the weather and sea conditions at the site and forced SFI to accelerate. SFI also contends that the government breached the duty of good faith and fair dealing.

Previously, the Board dismissed for lack of jurisdiction SFI's claim that it was delayed by a bid protest because SFI never submitted that claim to the contracting officer (CO). *Shoreline Found., Inc.*, ASBCA Nos. 62876, 63616, 23-1 BCA ¶ 38,468 (*SFI I*). Then, in *Shoreline Found., Inc.*, ASBCA Nos. 62876, 63616, 24-1 BCA ¶ 38,607 (*SFI II*) *recon. denied* 24-1 BCA ¶ 38,678, the Board granted the government partial summary judgment with respect to SFI's contention that the specifications were either defective or contained a misrepresentation as to when the weather and sea conditions would be suitable for performing work.

In ASBCA No. 63616, SFI is challenging the government's assessment of liquidated damages in the amount of $249,690 (R4, tab 58).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

The Board conducted an eight-day hearing in May 2025.  Both liability and quantum are before us.  The Board denies No. 62876.  The Board sustains No. 63616.

FINDINGS OF FACT

Solicitation

1.  On August 9, 2016, the United States Army Corps of Engineers, Jacksonville District, (USACE) issued the solicitation for the above-captioned contract, Hurricane and Storm Damage Reduction Project, Brevard County, Florida, Mid-Reach Segment - Mitigation Feature (R4, tab 1 at 1-2).  The solicitation originally provided for the submission of bids on September 12, 2016, but the deadline was extended to September 26, 2016 (*id.* at 2, 745[1]).

2.  The solicitation provided that the contractor would manufacture, transport, and install concrete reef mats with coquina rock surfaces to establish a 4.8-acre artificial reef in water depths of 14 to 16 feet Mean Low Water, 1,000 feet from shore.  A reef mat consists of 18 reef blocks (2.6-feet by 2.6-feet by 1-foot-high pieces of concrete/coquina) connected by longitudinal and lateral cabling in a three by six block pattern to form an articulated mat of about 8 by 16 feet.  Forty-five reef mats placed together form a reef set of approximately 0.14 acres.  The project consisted of 36 reef sets at 10 sites, for a total of 1,620 mats.  (*Id.*, tab 1 at 208-09)

3.  The placement area for the mats extended for about five miles off the coast of Brevard County beginning 16 miles south of Cape Canaveral, near two municipalities, Satellite Beach and Indian Harbor Beach, and unincorporated Brevard County.  This area, which is in the middle of the approximately 40-mile section of Brevard County south of Cape Canaveral, is referred to as the "Mid-Reach."  (*Id.* at 209; tr. 4/131)

4.  The solicitation provided that the contractor would lower the reef mats and place them on the bottom no more than 12 inches from adjacent reef mats.  It prohibited dropping the mats through the water or pushing or pulling them after they were in contact with the floor or geotextile, meaning that the contractor would have to lift and reset the mat if it was not in the correct position.  (R4, tab 1 at 440, 452)

---

[1] Citations are to the .pdf page number of the electronic file.

2

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Weather Considerations

5.  The solicitation did not place any restrictions on the time of year in which the contractor could work.  However, SFI was aware that the winter months are generally unsuitable for marine construction in Florida (tr. 1/156-57; tr. 2/65; tr. 3/19).

6.  Dr. Kevin Bodge, a coastal engineer who worked as a consultant for Brevard County, testified at the hearing.  Dr. Bodge has worked in the Mid-Reach since 1988 (tr. 4/132).  He testified credibly that local watermen know that the best chance for "calm-ish" seas in Brevard County is from mid-May to mid-September.  (He defined watermen to mean anybody who works in or recreates around the ocean, including marine contractors, marine surveyors, marine biologists, fishermen, and surfers.) (Tr. 5/106)  But this is merely a rule of thumb.  Dr. Bodge testified that sometimes the best weather can be in the winter and the worst in July and August.  In his work he has lost entire summers to unrelenting storms, whereas the two winters preceding his testimony had 30-day stretches of seas like "flat glass" from January into February. (Tr. 5/87-88)

7.  To a certain extent, the solicitation reflected these parameters.  In a section entitled "Placement Season," it provided "[i]t is anticipated that the placement season may occur between April 1st and October 1st" (R4, tab 1 at 424).  In a section entitled "Project Order of Work," it provided "[p]lease note, the area where placement sites are located experience inclement weather which typically occurs between November 1st and May 1st" (*id.* at 428).  Thus, the solicitation provided that USACE "anticipated" that placement "may occur" in a six-month period beginning in April, but that April is also the last month of the inclement weather season.

8.  In the "Weather and Water Stage Data" section, the solicitation provided cautionary guidance on the weather during the work season:  "Weather Conditions. The project area is subject to tropical storms and hurricanes from June through November, and to windy and/or rainy weather during any time of the year. . . The wet season in the project area is from May through October" (*id.* at 206).  The solicitation further provided that "the project area may be affected by stormy, windy and/or rainy weather, including thunderstorms, during any time of the year" (*id.* at 212).

9.  As we discussed in *SFI II*, 24-1 BCA at 187,671-72, the solicitation placed responsibility on the bidders to determine how the weather conditions would affect safety and work conditions (R4, tab 1 at 206 ("[i]t shall be the contractor's responsibility to obtain information concerning weather conditions in the project area"); *id.* at 212 ("The Contractor shall be responsible for obtaining information concerning rain, wind and wave conditions that could influence safety, dredging and disposal operations prior to submitting a proposal or bid"); *id.* at 428-29 ("The Contractor shall ascertain the environmental conditions which can affect water and

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

land access, such as climate, terrain, winds, current, waves, swells, depths, shoaling, and scouring tendencies"). The contract contained Federal Acquisition Regulation (FAR) 52.236-3, SITE INVESTIGATION AND CONDITIONS AFFECTING THE WORK (APR 1984). This clause provided, among other things, that:

> (a) The Contractor acknowledges that. . . it has investigated and satisfied itself as to the general and local conditions which can affect the work or its cost, including. . . . (3) uncertainties of weather, river stages, tides, or similar physical conditions at the site. . . . and (5) the character of equipment and facilities needed preliminary to and during work performance.

(R4, tab 1 at 573)

10. The solicitation identified various web sites in which wind and wave information from buoys or other devices in the general vicinity of the project site was available, although none of the sources was located within the footprint of the project site (R4, tab 1 at 205; app. ex. D-5; tr. 5/193). The listed sources included the National Data Buoy Center.

## SFI's Proposal

11. SFI is a marine contractor formed in 1986 that has completed hundreds of projects (tr. 1/36, 44). However, SFI lacked certain types of experience that would prove to be relevant to this project: it had never worked in the waters off Brevard County; it had "not very often" worked in the open ocean; it had never performed a job involving precise placement of an artificial reef; and it had rarely worked in low visibility waters (tr. 1/49, 96; tr. 2/39; tr. 3/87-88).

12. SFI appointed Carlos Varela to prepare its estimate, with SFI's president and co-owner, James Royo, as his supervisor (tr. 1/36, 68). Mr. Royo testified at the hearing but Mr. Varela did not. When asked at the hearing whether he had investigated the weather conditions, Mr. Royo testified that "it didn't seem like it needed to be done," because of the window (April 1 to October 1) identified in the solicitation (tr. 1/128).

13. SFI did not believe that the NDBC buoys would provide pertinent information for the job site (tr. 1/123-24; tr. 2/30, 34). Mr. Varela instead obtained wind information from Melbourne, which is also not in the project area; it is on the Florida mainland south of the project site (tr. 1/139; tr. 2/32). The record does not identify the precise location of the data, but the Melbourne airport is a likely source (tr. 5/117).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

14. Mr. Varela "came up with a wind chart" indicating that wind speeds over 16 nautical miles would generate 4-foot waves/swells. This was an important data point because SFI believed that it was capable of working in waves up to 4 feet. (Tr. 1/94, 138)

15. The data that Mr. Varela reviewed must have shown a small number of days in Melbourne with 16-knot winds, because Mr. Varela calculated that an entire season (April through September) would have only five days in which SFI could not work. This included zero days in July, August, and September, the heart of the tropical storm and hurricane season. (Tr. 1/138, 141-43; app. supp. R4, tab 157)

16. The problem with this methodology is that the relative absence of wind on the land does not mean that the ocean will be calm. Wind data on land best correlates to conditions on a lake or bay, not the open ocean. Ocean conditions are in large part controlled by the weather in the North Atlantic Ocean. Thus, while any particular day in Melbourne might have placid conditions on land, the sea could be rough due to a storm that developed hundreds of miles away. (Tr. 1/61; tr. 5/24-25, 118)

17. As a result, Mr. Varela's calculations would not reliably predict the frequency of four-foot seas at the project site. Based on this, and the testimony that SFI had "not very often" worked in the open ocean (finding 11), we conclude that SFI did not understand what would cause waves/swells at the project site.

18. At the National Data Buoy Center (NDBC) web site identified in the solicitation, a bidder could find buoys including No. 41113, which was 16 miles north of the project in 32 feet of water. This buoy, like the project site, was within the Canaveral bight. (Tr. 5/195; app. ex. D-5) The NDBC buoys provide hourly data that include "wind speed, wind gusts, atmospheric pressure, air temperature, sea temperature, wave height, wave direction, and wave period." (R4, tab 1 at 205) The data could be downloaded from the site (app. proposed finding of fact (APFOF) ¶ 105)). If a contractor was unwilling to download and analyze the data itself, there were numerous coastal engineers in Florida who could do it for the contractor (tr. 5/214).

19. Other data sources listed in the solicitation included a USACE wave information study site located nine miles to the east of the project site that provided "a hindcast time series of wave heights, periods, and directions taken at 1-hour intervals for the 32-year period extending from 1980-2012, at a station located in 21 meters (69 feet) of water." The solicitation also listed a Florida Institute of Technology site to the south that provided data (real-time and archived) including "wind speed, wind direction, atmospheric pressure, air temperature, sea temperature, water level, wave height, wave period, and wave direction." (R4, tab 1 at 205)

5

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

20. While these data sources were not within the project site, they formed a triangle or triangles around the project site (tr. 5/204-06).

21. Neither party has provided the Board with wave data from these sites for the years prior to bid. The parties have not provided any data at all from the USACE wave information study site or the Florida Institute of Technology site.

22. USACE scheduled a site visit at 10:00 a.m. on August 18, 2016, which Mr. Varela attended (app. supp. R4, tab 328 at 1). The site visit consisted of a visit to the beach near the project site. Mr. Varela informed Mr. Royo that the sea was calm. (Tr. 1/146-49; *see* app. supp. R4, tab 114 at 220 (recording waves of 0.53 to 0.58 meters between 10:00 a.m. and 12:00 p.m. on August 18, 2016)). SFI never visited the site in a boat or asked USACE for a more in-depth site visit before submitting its bid (tr. 1/148-49; tr. 2/26).

23. Neither SFI, nor any other offerors, submitted pre-bid questions about the weather or sea conditions (tr. 5/149).

24. SFI did not ask USACE or its subcontractors about water visibility at the site (tr. 2/43).

25. SFI bid the contract based on an assumption that it would place 7.5 mats per day (tr. 1/167).

26. The contract required SFI to place the mats at four to five sites in 2017 and five to six sites in 2018, or 40-50% in the first year and 50-60% in the second (R4, tab 1 at 424).

## The Contract

27. On September 29, 2016, USACE awarded SFI the above-captioned contract in the amount of $13,236,255.08 (R4, tab 55 at 2, 4). The contract incorporated the solicitation (*id.*; R4, tab 1).

28. The contract required completion within 730 days after issuance of the notice to proceed (R4, tab 1 at 73). USACE issued the notice to proceed on November 29, 2016 (R4, tab 3).

29. Prior to the start of construction, the contract required a variety of submittals, including an accident prevention plan, a quality control plan, and an environmental protection plan. SFI would not be allowed to begin work until it received at least interim approval of these plans. (R4, tab 1 at 147-48, 209, 299, 300, 325-26)

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

30. The contract required SFI to submit a preliminary project schedule within 15 days of the notice to proceed, and an initial project schedule 42 days after the notice to proceed (R4, tab 1 at 237).

### SFI's Work on the Project

#### A. The Barge

31. One of the key decisions for SFI was the type of barge that would hold the crane used for placement of the mats. SFI bid the project with an anchor barge, which is a barge that floats on the surface and has an anchoring system. SFI hoped it would alleviate harsh movements caused by sea conditions, but it had never used an anchor barge before. (Tr. 3/95, 100-01; APFOF ¶ 181)).

32. John Wilson, the USACE contracting officer's representative (COR) and project engineer, and Dr. Bodge testified credibly that a jack-up barge is more stable and enables a contractor to work in higher wave conditions (tr. 5/16; tr. 6/265; tr. 7/47). A jack-up barge has four legs that are dropped to the bottom. The platform is then raised above the water, allowing the contractor to avoid current and wave activity. (Tr. 3/96; tr. 7/64) COR Wilson testified that a jack-up barge would have allowed the contractor to work year-round and in rough seas (tr. 7/47). He testified credibly that a floating barge is "really not what you want on a wave-rich environment" and that it would exacerbate water visibility issues (tr. 6/266). He has been employed by USACE since 1987 but had never seen a contractor use an anchor barge to perform comparable work (tr. 6/257; 7/55-56).

33. SFI's superintendent, Sal Daher, testified credibly that a jack-up barge would have been stable "like being on land" but that it would not have stopped the mats from swaying once they were in the water (tr. 2/129-30).

34. The Board concludes based on the weight of the evidence that a jack-up barge would have been more stable than an anchor barge and would have given SFI a greater ability to work in seas with higher waves/swells.

#### B. Submittals/Pre-Construction

35. On December 19, 2016, SFI submitted a preliminary project schedule showing that mat placement would begin on April 14, 2017 (app. supp. R4, tab 166 at 1-2).

36. On April 7, 2017, SFI submitted an initial project schedule that pushed the start of mat placement to May 9, 2017 (R4, tab 169 at 42-43). In reviewing the schedule, USACE commented that it was not clear if SFI had taken weather into

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

account.  SFI responded that it had and that it planned on a six-day work week that gave it a seventh day if there was adverse weather.  (*Id.* at 5)

37.  On May 26, 2017, SFI still had not begun mat placement.  Paul Cotter, the USACE resident engineer and administrative contracting officer (ACO), issued a letter of noncompliance to SFI.  Among other things, ACO Cotter stated that SFI's accident prevention plan, quality control plan, and environmental protection plan had not been approved and required re-submittal.  He also observed that SFI had only fabricated 18 mats to date and that most of them had not been cured properly.  (R4, tab 12 at 1, 3)

38.  On June 16, 2017, ACO Cotter wrote to SFI by email.  He stated that SFI had reported for weeks that the barge was being outfitted and then that it was ready to go.  However, he had gone to see the barge the day before and found that it was not ready.  (R4, tab 556 at 1; tr. 6/32-33).

### C.  2017 Mat Placement

39.  The parties agree that the contract required one tugboat per barge and that the tugboat had to stay with the barge (tr. 1/132; tr. 2/68; tr. 6/44; R4, tab 1 at 739).  In 2017, SFI used one barge, one tug, and one diver in the water (tr. 1/219; tr. 6/44-45).  This was not efficient because when all the mats on the barge had been placed, the barge and tug had to return to port and restock, which could mean two or more days with no mat placement (tr. 6/44; R4, tab 4 at 351, 353).

40.  Paul Stynchcomb, SFI's expert in construction management and scheduling, performed an analysis of wave conditions, and prepared several graphs.  The graphs show that most days from May 6 to June 27, 2017, had recorded wave heights of less than 3 feet, with only occasional spikes above that level (ex. D-6 at 2-3).  Accordingly, the Board finds that SFI wasted more than a month in which it was feasible to work.

41.  On June 27, 2017, SFI began mat placement but managed to place only two mats even though the wave heights were just 1.3 feet (R4, tab 5 at 464-65).  On June 28, 2025, it placed six mats in waves of 1.0 feet (*id.* at 468-69).

42.  After the first two days of placement, SFI experienced delays for which it was responsible involving the ladder on the barge and the motor on its crew transport boat (tr. 6/35-36, 175-79).  With these delays and subsequent weekends and Independence Day, it did not resume mat placement until July 11, 2017 (R4, tab 5 at 513; app. ex. D-11 at 1).

43.  The Board finds that all of the delays through July 10, 2017, were the fault of SFI.

8

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

44. As of July 31, 2017, SFI had placed only 90 mats (ex. G-14 at 2; app. ex. D-11 at 1).

45. SFI was unable to work on July 31 and August 1, 2017, because of a tropical storm (R4, tab 4 at 373, 377).

46. As of August 31, 2017, SFI had placed 234 mats (ex. G-14 at 2; app. ex. D-11 at 1).

47. Hurricane Irma made landfall in the Florida Keys on September 10, 2017, and then moved to the north, reaching north Florida on September 11. https://www.weather.gov/mfl/hurricaneirma.

48. Merely observing that the hurricane was over Florida for two days understates the effect on the project. The USACE quality assurance report for September 4, 2017, states that SFI placed 13 mats before stopping to prepare for Irma. USACE stated that the seas were 1-2 feet that day. (R4, tab 4 at 484) The USACE quality assurance report for September 5, 2017, states that Port Canaveral had denied SFI's request to remain at the port for the hurricane; SFI eventually brought the barge to Green Cove Springs, Florida (*id.* at 489, 493). By September 7 the seas were 5-6 feet (*id.* at 493). On September 8, they were 7-8 feet (*id.* at 496). On September 9, they were 8-10 feet (*id.* at 499). On September 10-11, when the hurricane was over Florida, the seas reached 23 feet (*id.* at 502, 505). On September 12, 2017, the seas were 6-7 feet; on September 13, they were 4 feet (*id.* at 508, 511). While the seas then briefly returned to the 2–4-foot level, by September 16, 2017, they were back to 5-7 feet (*id.* at 514, 517, 520). Two more hurricanes, albeit not as close to Florida, were yet to come.

49. In an October 2, 2017 email to USACE, SFI stated that its invoice for September was "next to nothing due to the effects of hurricane[s] Irma, Jose and Maria" (R4, tab 4 at 577). More than a year later, by letter dated November 21, 2018, from SFI to ACO Cotter, SFI requested a time extension and attached a report by a meteorologist analyzing weather on the east coast of Florida in September 2017 (R4, tab 36 at 3). The analysis stated:

> September of 2017 was a particularly difficult month due mainly to tropical cyclones . . . Hurricane Irma tracked north through the western Florida peninsula and shows up in the data from roughly September 7-12. Hurricane Jose tracked through the Atlantic well east of Florida, but it shows up in the sea state data from about September 17-20, and hurricane Maria tracked north to the east of Florida a

9

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

> bit later in the month, and shows up in the data from about
> September 23-27.

(*Id.* at 14). While there were short gaps of time between the three hurricanes, the sea did not sufficiently calm for SFI to resume work before the next hurricane (or the end of the season) occurred.

50. By letter dated October 10, 2017, SFI notified ACO Cotter that it was demobilizing for the season. It stated that "deteriorating weather conditions since September 4, 2017, Hurricane Irma, have hampered our ability to return to normal operations." (R4, tab 14)

51. SFI placed 252 mats in 2017 (Ex. G-14 at 2; app. ex. D-11 at 2). This was about 15.4% of the total and far short of the 40-50% required by the contract. As described above, SFI had informed USACE that it had planned the work based on a six-day work week, which, in theory, gave SFI some cushion if there was adverse weather (or other delays), even if it had bid zero weather days from July through September (findings 15, 36). Despite the schedule, the record shows that SFI placed mats on only three Saturdays and three Sundays in 2017 (Ex. G-14 at 2; app. ex. D11 at 1-2). For example, the SFI quality control reports for Saturday, July 29 and Sunday July 30, 2017, state that there were 1.0-foot seas but that these were non-workdays and that there were no SFI personnel at the site (R4, tab 5 at 581, 583). The USACE quality assurance report for July 31, 2017, stated that SFI had not worked "by choice" the previous two days (R4 tab 4 at 373).

52. The Board further observes that SFI's one-barge, one-tug operation that required a return to port to load mats and its failure to work on weekends resulted in five days without mat placement in July in a period of good sea conditions. The record shows that SFI placed mats on Wednesday, July 19, 2017, and then returned to port (R4, tab 4 at 348). It did not resume placing mats until Tuesday, July 25, 2017. SFI's quality control reports list the sea conditions on every one of these days except Sunday, July 23, 2017. On each of these days the seas are listed as 1.3 or 1.6 feet. (Ex. G-14 at 2; ex. D-11 at 1; R4, tab 5 at 547, 551, 555, 558, 560) Thus, SFI failed to take advantage of five days of good weather.

53. In summary, the Board finds that SFI's poor performance in 2017 was largely caused by its management and work plan, the late start, and the three hurricanes in September.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

D. 2018 and 2019 Work

54. Contract section 01 32 01, paragraph 3.9, Failure to Achieve Progress, provides:

> Should the progress fall behind the approved project schedule for reasons other than those that are excusable within the terms of the contract, the CO may require provision of a written recovery plan for approval. The plan must detail how progress will be made-up to include which activities will be accelerated by adding additional crews, longer work hours, extra work days, etc.

(R4, tab 1 at 242)

55. Citing this paragraph, ACO Cotter issued a notice of noncompliance to SFI on March 5, 2018. He stated that SFI was approximately 225 days behind schedule but that he could not identify the exact number because SFI had failed to submit the required periodic schedule updates. While he acknowledged that there had been "several tropical storms" in September 2017, he observed that SFI had not requested a time extension. He demanded that SFI submit a recovery schedule per paragraph 3.9.3, Recovery Schedule (R4, tab 20 at 2-4)

56. On March 15, 2018, SFI met with USACE officials to discuss the project (tr. 1/215). SFI then made three important changes for 2018. First, it changed its project manager (tr. 3/21). Second, SFI added a second diver, which allowed for one diver at each end of the mat to maneuver it into place (tr. 1/219; tr. 3/178; tr. 6/44-45). This was important because, according to Sal Daher, SFI's superintendent, SFI had had to pick up mats, which weighed about 12,000 pounds, and reposition them as many as 40 times to get them in the proper place (tr. 2/83, 102). Third, SFI added a second barge, used as a dedicated material barge, and a second tug, that allowed for continuous placement rather than stopping for two or more days while the single barge returned to port and reloaded (tr. 1/190; tr. 2/68; 3/79; tr. 6/44).

57. SFI was able to begin mat placement in April 2018, in line with the placement season referenced in the solicitation. On April 18-20, it placed 8, 10, and 18 mats respectively (ex. G-14 at 3; app. ex. D-11 at 2) and appeared to be off to a good start. But on April 21 USACE shut down SFI's mat placement because it did not have a standby diver (R4, tab 5 at 1168). ACO Cotter testified credibly that putting a diver in the water without a standby diver was a "heinous safety violation" (tr. 6/59). SFI remained shut down until April 28, 2018 (R4, tab 26 at 2).

58. Despite this initial misstep, the changes made by SFI resulted in a dramatic

11

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

improvement in performance. We observe, for example, that between June 1 and 12, 2018, SFI placed more mats than in all of 2017 (Ex. G-14 at 3-4; app. ex. D11). If it had continued at this rate, SFI would have completed the contract early. But it did not recognize until it was too late that it was placing mats more quickly than it was manufacturing them. While SFI eventually ordered its supplier to increase production, it was too late. (Tr. 3/203, 208). SFI released the second barge and tug boat from the site (tr. 3/210). While it is not clear exactly when it stopped working with the two-barge, two-tug system, SFI stopped recording hours for the second tug in its quality control reports on June 22, 2018 (R4, tab 5 at 1558) SFI's expert calculated that SFI's average daily mat placement then dropped by more than 50% (app. ex. D-10).

59. SFI brought the second barge and tug back to the site on August 8, 2018 (R4, tab 5 at 1694). Another burst of productivity followed; SFI placed more mats from August 8 to 24 than it had in the 2017 season (ex. G-14 at 4; app. ex. D11 at 4).

60. The sea conditions remained good for the rest of August with waves ranging from about 1.0 to 2.5 feet (ex. D-6 at 11), but in the period from August 25-31, 2018, SFI conducted placement on only August 29-30, when it placed 45 mats. The delays during this period were the fault of SFI because it had placed 18 mats in the wrong location and it also had to wait for concrete test results (R4, tab 5 at 1745, 1747, 1755; ex. G-14 at 4; app. ex. D-11 at 4).

61. The weather had already started to decline by September 8, 2018, when USACE noted no work that day due to powerful swells and an approaching hurricane (R4, tab 4 at 1052). On September 11, 2018, USACE noted that SFI was demobilizing due to the approach of Hurricane Florence (*id.* at 1053). On September 17, 2018, SFI stated in its quality control report that it had lost seven days due to "storm activity" (R4, tab 5 at 1800). SFI placed 51 mats on September 19-20, 2018, but that was the end of its 2018 season (ex. G-14 at 5; app. ex. D-11 at 5).

62. On September 28, 2018, SFI notified ACO Cotter that due to deteriorating conditions after September 20, 2018 it had decided to demobilize from the site (R4, tab 33).

63. In 2018, SFI placed 69.4% of the mats, more than quadrupling its 2017 performance, but not enough to make up for the poor results in that year (ex. G-14; app. ex. D11).

64. SFI mobilized for a third season and resumed mat placement on June 5, 2019. It placed the final mats on June 22, 2019. (R4, tab 5 at 2323, 2357). Due to some minor changes, the final number of mats increased from 1,620 to 1,638 (ex. G-14 at 5).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

SFI's Certified Claim

65.  On October  21, 2020, SFI submitted a certified claim seeking $2,838,231 (R4, tab 50).  The crux of SFI's claim was that the weather in April, May, and September "differed vastly from the working conditions forecasted in the Contract Documents" (*id.* at 13).  Among other things, SFI complained that during these months, waves often exceeded one meter[2], which caused "murky underwater conditions" and "rendered the requisite underwater diving operations unsafe, as well as impeding the ability of the crane barge to remain on position for the precision mat placement requirements." (*Id.*)  SFI contended that it was able to work on only 11.1% of the available workdays in September 2017, 46.2% of the workdays in April and May 2018, and on 29.2% of the workdays in September 2018 (*id.*).

66.  Exhibit 8 to SFI's claim was a report by Locus Weather (R4, tab 50(h)).  While not signed, the first page of the document lists four people with degrees in Atmospheric Sciences or Meteorology.  The report states that the best source of data is the weather buoys in the region and that Locus Weather had used the data from the National Data Buoy Center.  The wave data in the report is based on Buoy 41113 (16 miles to the north of the project site), Buoy 41009 to the northeast (20 miles east of Cape Canaveral), and Buoy 41114 (40 miles to the south) (*id.* at 3; ex. D-5).

67.  Locus Weather observed that wave heights greater than one meter occurred more frequently at Buoy 41009, "which makes sense as it is farther offshore" (*id.* at 4).  It concluded that the other two buoys, which are closer to shore, "may be a better indicator of difficult conditions at the job site" but that data from 410009 "should not be totally discounted" (*id.*).  Locus Weather prepared a spreadsheet identifying days when waves exceeded one meter.  The spreadsheet supported SFI to the extent that it showed that most days from September 7, 2017, to the end of that month had waves of at least one meter and that there were also numerous days in April, May and September of 2018, with waves of at least one meter, albeit less so at Buoy 41113 (*id.* at 13-15, 19).

68. Because SFI's claim focuses on poor water visibility and high waves/swells, we will summarize the evidence on both issues.

---

[2] 1 meter = 3.28 feet or 3 feet, 3 and 3/8 inches

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Water Visibility[3]

69.  To begin, the Rule 4 file does not document a consistent problem with low visibility water.  Appellant's expert, Mr. Stynchcomb, summarized the evidence as follows:

> Q (App. counsel) And did you also assess visibility
> impacts in connection with this analysis?
>
> A There were constant complaints about turbidity, but the
> record only shows three or four days in which the -- the
> divers could not see. So that was a -- a bit more elusive to -
> - to try to pin down to a day.

(Tr. 8/38-39)

70.  Despite the lack of documentation, witness testimony convinced the Board that the site often had low visibility.  SFI Superintendent Daher, Dr. Bodge, and COR Wilson all agreed that the water could be turbid or low visibility when there was significant wave activity (tr. 2/144; 5/35; 7/80).

71.  The Board will now consider whether the low visibility impacted the divers, and whether the conditions were foreseeable by bidders.

72.  SFI did not use ordinary laborers to place the mats but rather professional divers (tr. 1/102).  Unrebutted testimony establishes that such divers often work in low visibility water.  SFI's president, Mr. Royo, Brevard's consultant, Dr. Bodge, and USACE's construction representative, Howard Lyons, all agreed on this point (tr. 1/105; 2/40; 5/36; 6/142, 194, 254).  While this might have left the door open to testimony from the divers that the water was worse than the low visibility water that they usually experience, SFI did not present testimony from any of the divers.  Accordingly, SFI has not proven that the visibility at the site was outside the range of what commercial divers ordinarily encounter.

73.  As to foreseeability, we have already found that SFI did not ask USACE or any of its subcontractors about visibility prior to bid (finding 24).  SFI seems to have

---

[3] During the hearing, the parties frequently used the words "turbid" and "turbidity" when discussing low visibility water.  Turbidity refers to sediment suspended in the water and is one cause of low visibility.  From a coastal engineering perspective when discussing diving operations, it is more common to speak of "visibility."  (Tr. 4/240)

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

had a rather passive approach; Mr. Royo testified he did not discuss visibility with the subcontractors because he assumed they would tell him about any such issues without him asking (tr. 2/43).

74. Part of the problem may be SFI's location in Broward County, Florida and its lack of experience in Brevard County (tr. 1/49; finding 11). Dr. Bodge testified credibly that southeast Florida, of which Broward is part, has "chronically good underwater visibility" (tr. 5/35). Brevard County is only five counties north of Broward.[4] But, as Dr. Bodge explained, there is a big change in water conditions north of Palm Beach County, such that the conditions in Brevard are "the polar opposite" of southeast Florida (*id.*).

75. Dr. Bodge testified credibly that commercial divers would "absolutely" be aware of how water visibility changes as one moves up the coast (*id.*). Moreover, even if SFI did not know what the visibility is like, the information is readily obtainable through research or discussions with people experienced in the area (tr. 5/36). SFI did not present any testimony to the contrary.

76. Accordingly, the Board finds that the water visibility issues were foreseeable prior to bid.

## Wave Heights

77. Superintendent Daher testified concerning the difficulty of mat placement at various wave heights. He testified that if the waves were 2 feet or less, SFI was able to work. He described placing mats in waves in the 2- to 3-foot range as "manageable" but that it started to become more difficult after 2 feet. He testified that work became increasingly difficult after the waves exceeded 3 feet. He described work in 4-foot waves as "very difficult to almost unmanageable at times." (Tr. 2/98-99). He acknowledged that SFI placed mats on a limited number of days where there were seas greater than 4 feet (tr. 2/99, 145).

78. Mr. Stynchcomb prepared an exhibit showing that SFI placed 83% of its mats when waves were 2.0 feet or less and 98% of the mats when waves were 2.5 feet or less. He found that SFI placed no mats in seas above 3 feet. (Ex. D-8) While we believe it is true that SFI placed the vast majority of the mats in seas less than 3 feet, Mr. Stynchcomb's analysis is not entirely accurate based on Mr. Daher's testimony. Mr. Stynchcomb was forced to admit on cross examination that there were days in which SFI placed mats in 4-foot seas (tr. 8/102).

---

[4] From north to south, the counties are: Brevard, Indian River, St. Lucie, Martin, Palm Beach, Broward, and Miami-Dade.
https://floridadep.gov/sites/default/files/CPI-coastal-Florida-map.pdf.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

79.  There is no dispute that waves of 3-feet or more occurred on a significant number of days or that SFI was progressively less successful as wave heights increased.  Rather, the dispute is whether the conditions were foreseeable based on a review of the data from the NDBC buoys.  To answer that question we must determine whether these buoys provided a reasonable approximation of the site conditions.

80.  The only SFI fact witness who might have been able to answer this question was Mr. Daher.  But he never observed conditions at the buoy sites.  He testified that he was 15 miles from a buoy.  This may be an overstatement but, based on his testimony that the crew boat would travel to the site at 100 yards from the beach, he may never have been within several miles of a buoy (tr. 2/125-127).

81.  We turn to SFI's daily quality control reports.  In 2017, SFI recorded wave heights by citing Buoy 41113 until August 7, 2017 (R4, tab 5 at 610; tr. 3/37).  In the days that followed, SFI stopped recording wave heights (*e.g.*, R4, tab 5 at 614, 617).  On some days for the remainder of the project SFI stated that there were "high swells" or "heavy swells" or "rough seas" (*id.* at 620, 652, 1210, 1660).  There are also some days where SFI did list wave heights but without identifying the source of the information (*e.g.*, R4, tab 5 at 1140, 1460).

82.  SFI's quality control manager was responsible for preparing the quality control reports (tr. 3/28).   Unfortunately, he did not testify and we do not know why he failed to keep consistent track of sea conditions or what the source of his information was when he did list wave heights.

83.  We next turn to SFI's experts.  As described above, in its certified claim, SFI submitted a report from Locus Weather that described the area buoys as the "best source for data…" (finding 66).  While the report examined data from three buoys, it concluded that Buoy 41113 and Buoy 41114 (to the south) would give the most accurate information for the project site (finding 67)

84.  SFI's testifying expert, Mr. Stynchcomb, prepared an analysis of wave heights at the project site to determine the number of compensable weather days (tr. 8/16-18, 38-40).  He reviewed SFI's daily reports and other documents but found that "[t]here were large periods of time in which there was no report" (tr. 8/39).  Mr. Stynchcomb used Buoy 41113 to prepare a graphical depiction of the wave heights in each work season and to prepare the table in which he concluded that SFI placed 98% of the mats in seas of 2.5 feet or less (app. ex. D-6, D-8).  He used this buoy because it was "fairly close" to the site and he believed it was "the best we could do" (tr. 8/17-18, 106).  Mr. Stynchcomb spent two to three days downloading the data and preparing the graph and table (tr. 8/114).

16

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

85. Dr. Bodge testified that the data from the NDBC buoys would have provided "a good historical overview of the kind of conditions that have been observed [in the Mid-Reach] over the last 10, 15, 20 years prior to reef construction" (tr. 5/27).

86. Based on this record, there is no basis for the Board to conclude that the site conditions differed in a meaningful way from those at the NDBC buoys.

87. The only NBDC data in the record prior to bid is from Buoy 41113 in 2016. The Board observes that this buoy recorded wave heights greater than one meter on 29 of the 91 days from April 1 to June 30, 2016. (R4, tab 114 at 87-173) Accordingly, if SFI had reviewed this data, it would have realized that a bid based on five weather days per season was unreasonable.

### The Superior Knowledge Claim

88. SFI contends that USACE had superior knowledge of the weather and site conditions. SFI's claim is largely based on a document that Dr. Bodge wrote in 2007 when he was employed by Olsen Associates, Inc., entitled "Practical Considerations of Depth for the Construction of Nearshore Mitigation along the Mid Reach Coastline of Brevard County, Florida" (hereinafter "Olsen 2007") (R4, tab 135). SFI was not aware of, and did not obtain Olsen 2007, until after it filed this appeal (tr. 1/188-89). But it is undisputed that Brevard County had provided Olsen 2007 to USACE before USACE issued the solicitation (R4, tab 137b at 20).

### Olsen 2007 and Bodge 2013

89. Olsen 2007 is a document Dr. Bodge wrote on behalf of Brevard County, which wanted to replenish the sand on its beaches (tr. 4/127, 146, 166). The replenishment was complicated by the presence of natural rock outcroppings (or reefs) that extend 400 feet from the shoreline to water depths of about -4 feet mean low water (tr. 4/140-42; tr. 5/9; R4, tab 135 at 2). While these rocks can be a nuisance to bathers, they provide habitat for ocean life (tr. 4/142-43). A large-scale addition of sand would bury the rocks, which necessitated the development of "mitigation features" (*id.* at 140-41, 143).

90. Dr. Bodge crafted a two-step approach in which an artificial reef would be constructed in tandem with the beach replenishment (*id.* at 149-51). In about 2005, he proposed a "simple mattress and boulder solution," which was rejected by the regulatory agency, the Florida Department of Environmental Protection (FDEP) (*id.* at 148-49, 161).

91. Dr. Bodge drafted the Olsen 2007 report in response to questions he had received from the regulators, who wanted "in-kind mitigation" (tr. 4/192, 194; 5/9).

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

This would have required construction of the artificial reef where the naturally occurring rocks were, which was in the surf zone.

92. Dr. Bodge did not believe that construction of an artificial reef in the surf zone in Brevard County was safe or feasible. In Olsen 2007 he set out to explain why. (Tr. 5/9-11) With respect to safety, he stated that the placement of an artificial reef in the surf zone near shore could lead to drownings, broken bones, or other injuries (R4, tab 135 at 19-20).

93. With respect to construction, prior to writing the report, Dr. Bodge purchased information about waves in the Mid-Reach from a Dr. William Dally. This information is referred to as the "Dally Data." The Dally Data are a hindcast, meaning that it involves modeled predictions of past conditions, rather than data from buoys. The Dally Data contains wave height information from June 1954 to June 2004 and consists of 1,449 pages and 73,000 lines. (R4, tabs 131a-131i; tab 109 at 3; tr. 5/22-23; APFOF 46-47, 104) The Dally Data came from water 1 to 3 feet deeper[5] than the project site. While the precise location is unclear, it is closer to the project site than the NDBC buoys. (Tr. 5/23; R4, tab 135 at 7 (stating that the Dally Data was recorded offshore of R-106); R4, tab 1 at 209 (stating that the project area includes unincorporated Brevard County from R-105 to R-119))

94. Dr. Bodge obtained the Dally Data because it "was packaged and ready to use" (tr. 5/45). But Dr. Bodge believes that the data from the NDBC buoys would have provided "a good historical overview of the kind of conditions that have been observed [in the Mid-Reach] over the last 10, 15, 20 years prior to reef construction." He testified that he would not expect the Dally Data to be significantly different from the buoy data. (Tr. 5/27, 42-43)

95. Neither party has provided the Board with an analysis comparing the Dally Data to data from the NDBC buoys. Accordingly, we do not know if there is any difference in the wave heights in the two sources and there is no basis for the Board to conclude that the Dally Data was superior to the NDBC buoy data.

96. Olsen 2007 contains a mixture of Dr. Bodge's observations of the site, analysis of the Dally Data, and opinions about how the sea conditions will affect construction access to the site.

---

[5] We draw this conclusion by reconciling the standards used in Olsen 2007 to reflect water depth. The Dally Data comes from water -19.4 ft. NGVD (National Geodetic Vertical Datum), which equates to -17.5 ft. MLLW (mean low low water) (R4, tab 135 at 7, n.7). -17.5 MLLW would be approximately -17.2 feet MLW (mean low water) (*id.* at 21), which is about 1 to 3 feet deeper than the areas in which SFI placed the mats.

18

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

97. Dr. Bodge observed in Olsen 2007 that the water in the Mid-Reach has "chronically limited, near-zero visibility" (R4, tab 135 at 6). (He testified that he defined near zero visibility to mean visibility of 0 to 6 feet at most (tr. 5/33)). With respect to wave heights, Dr. Bodge expressed the opinion that the sea conditions are well known: "[t]he general area - from Cocoa Beach through Satellite Beach and Indialantic -- is well known for its consistent, high swell. It is not coincidental that multi-time world surfing champions Kelly Slater, Lisa Anderson, and others, grew up surfing in this area" (R4, tab 135 at 6).

98. Dr. Bodge expressed an opinion concerning the maximum wave heights in which a contractor would schedule work and in which it would be feasible to work, an opinion that was much more pessimistic than SFI's 4-foot projection:

> In general, a significant wave height of 2-ft or less is a reasonable proxy for the maximum swell in which a marine contractor would schedule or conduct vessel operations for the present work. Work in 3-ft seas is mostly infeasible.

(*Id.* at 7)

99. Based on his review of the Dally Data, Dr. Bodge stated that the site experienced significant wave heights[6] of 2 feet or less only 25% of the year. In the calmest months - June, July, and August - seas of 2 feet or less occurred somewhat more frequently: 33% - 48% of the time. Dr. Bodge then opined that the marine construction window for the project was "pragmatically limited to between mid-May and mid-September." (*Id.* at 9)

100. Dr. Bodge compared waves in Brevard County to those in West Palm Beach and Ft. Lauderdale. He stated that in those locations waves were 1 foot or less 20% of the time and were at the 1-2 foot level 32% of the time. By contrast, in the Mid-Reach waves were 1 foot or less only 2% of the time and were at the 1-2 foot level 21% of the time. (R4, tab 135 at 12). He also stated that on any given day, wave heights in the Mid-Reach were 47% larger than in West Palm Beach and 69% larger than in Ft. Lauderdale (*id.* at 14).

---

[6] Significant wave height means "the average height of the highest one-third of waves encountered over a specified period of time." *Bean Dredging, LLC v. United States*, 699 F. Supp. 2d 118, 123 (D.D.C. 2010)

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

101. In the conclusion of his analysis of construction access issues, Dr. Bodge stated:

> *The construction of mitigation reef structures in shallow water along Palm Beach and Broward Counties is <u>not</u> evidence that such structures can be practically constructed along the Mid Reach.* Particularly in light of the greater distances that separate the Mid Reach site from the nearest port, the generally higher seas, and the less-frequent duration of calm-seas, the ability to safely and reliably work in very shallow nearshore waters is significantly more limited along the Mid Reach than in south Florida.

(*Id.*) (Emphasis by Dr. Bodge)

102. It is important to note that Olsen 2007 is focused on the difficulties of working in water from +1 to -4 feet mean low water where the natural rock outcroppings were present. As Dr. Bodge testified, the purpose of the report "was strictly to identify the seabed depth at which these restructures [sic] may be constructed, which differed from the very, very shallow depths which the regulatory agencies had requested the placement" (tr. 5/7-8). While the report is dense and somewhat opaque at times, there is abundant support in the report for this testimony (R4, tab 135 at 2-3 (discussing probes taken at -3 to -6 ft MSL); at 3 and 6 (analyzing construction of the reef from shore which would restrict placement to within 60 ft. of shore); at 5 (analyzing difficulties of placement in less than 8 feet of water and also opining that 8 to 14 foot depths would also cause problems) at 6 (opining that the surf would cause the mats to fracture the natural reef); and at 19 (discussing dangers posed to swimmers if mats were placed in the swimming area). Dr. Bodge did not opine about the difficulties of working at -14 to -16 feet mean sea level with proper equipment and there is simply no way to know if any of the statements in the report concerning the difficulties of working in 3-foot waves in the surf zone would apply to working in 3-foot swells 1,000 feet from shore.

103. Dr. Bodge explained why it would be so difficult to work close to the beach:

> As seas rise, the ability to work in shallow water declines sharply. At issue is not only the wave surge - but also the risk of losing moorings or anchoring or other control of a vessel when in such shallow water. That is, in shallow water, closer to shore, the margin of physical space and water available to maneuver and recover control of a large

20

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

> vessel - before it becomes dangerously and/or intractably
> lost to the surf - is of paramount concern.

(R4, tab 135 at 7). While this is again not perfectly clear, the references to "the margin of physical space" and the danger of losing control of the vessel in the surf, suggest that he was only trying to explain to the regulatory agency why they should not build the artificial reef in the same place as the existing reef, that is, in water to a depth of -4 feet.

104. Dr. Bodge did not analyze in depth how equipment choices would affect the work but he suggested that if a jack-up barge were used the problems he described would be reduced to transporting the barge from port to the site (*id.*). At the hearing he testified that equipment choice was "fundamentally important" (tr. 5/17).

105. With respect to his opinions concerning the feasibility of working in 2- and 3-foot seas, Dr. Bodge testified that he had used these numbers because "operations often change when you get to two to three feet" (tr. 5/76). He testified that he did not consider 3 feet to be the actual limit at which the mats could be placed, but rather "a threshold for consideration of operations," and that he had performed marine construction from an oil platform in seas of up to six feet (tr. 5/74, 76). He testified that the purpose of his report was strictly to identify the depth at which the artificial reef could be placed, and not to be a definitive analysis of when and how they could be constructed, and that it was not intended for the development of cost estimates (tr. 5/7-8, 61-62). He testified that whether the contractor could actually work in 3-foot seas would be determined by the type of equipment it used, the number of pieces of equipment, the contractor's work plan and schedule (tr. 5/15).

Bodge 2013

106. More than five years after Olsen 2007, Dr. Bodge wrote a memorandum to a Brevard County official entitled "Mid Reach Reef Mitigation Design" (R4, tab 136) (Bodge 2013). USACE had Bodge 2013 while it was preparing the solicitation (R4, tab 137b at 20). The purpose of Bodge 2013 was to relay "several additional ideas related to the fabrication & installation" of the mats (*id.* at 1). Most of the memorandum is not relevant to this dispute. However, the last page contains a cost estimate in which Dr. Bodge made some statements or assumptions that SFI relies upon in further support of its superior knowledge claim.

107. Dr. Bodge calculated a cost of $1,534,000 for the first acre based on what appears to be a season of "May-August only" (R4, tab 136 at 5). He then adds "[f]or construction that continues into or after mid-September, add $600,000" (*id.*). He also stated that additional acres "might cost, say, $1,270,000" (*id.*). The phrasing appears

21

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

to indicate these are just rough estimates and we observe that the actual award price was about double Dr. Bodge's estimate (finding 27).

108. Dr. Bodge's estimate also assumed "plus, say, 50 weather days" (R4, tab 136 at 5).

109. The Bodge 2013 estimate takes up about one page (*id.*). Dr. Bodge described it at the hearing as "spitballing ideas" (tr. 5/114).

### Claim Denial and Appeal

110. On March 26, 2021, CO Grisell Gonzalez-Aquino denied SFI's claim (R4, tab 49).

111. SFI filed a timely appeal on April 6, 2021, that the Board docketed as No. 62876.

### SFI's Damages

112. SFI's expert, Mr. Stynchcomb, calculated a total of $2,664,084 in damages (app. ex. D-13). He itemized this amount as follows:

> Delay, lost productivity, and acceleration costs:
> $1,382,585
> 2018-19 hiatus & 2019 mobilization and demobilization:
> $642,645
> General and administrative costs of 15.6%:
> $314,982
> Profit at 10.2%:
> $238,702
> Bond premium of 0.887%:
> $22,870
> Change proposal preparation costs:
> $62,300
>
> **TOTAL          =          $2,664,084**

(*Id.*)

113. The delay damages are based on Mr. Stynchcomb's calculation that there were 92 weather delay days, of which 61 days were compensable (ex. G-18 at 4). Of the 61 days, 21 occurred during what he called the "Olsen Window" of May 15 to September 15 in which the seas were from three to four feet (*id.* at 4, 22; tr. 8/43 ). He classified days with waves greater than four feet as excusable but not compensable,

22

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

apparently because SFI had not planned to work on those days (ex. G-18 at 22; tr. 8/45)).

114.  The remaining 41 compensable days occurred between September 16 to October 1, 2017, April 1 to May 15, 2018, and September 16 to October 1, 2018. During these periods Mr. Stynchcomb classified all days in which SFI could not work due to weather as compensable.  (Tr. 8/43)  It is not entirely clear why he applied a different standard for these periods other than that he believed SFI "should not have been working during those periods" (tr. 8/14; app. ex. D-29).

115.  In his calculation of 61 compensable weather days, Mr. Stynchcomb included 18 compensable weather days in September 2017 that correspond with the three hurricanes (app. ex. D-29 at 1-2).

116.  Mr. Stynchcomb included a total of 16 compensable weather days from April 2018, which was identified in the solicitation as the last month of the inclement weather season.  Four of these days were also days in which USACE had shut down SFI for failure to maintain safe diving conditions (app. ex. D-29 at 3; findings 7, 57).

117.  Mr. Stynchcomb counted two compensable weather days in September 2018 that correspond to Hurricane Florence ((app. ex. D-29 at 5; finding 61).

118.  Mr. Stynchcomb also calculated that SFI experienced a 20-day loss of productivity in 2018 when it placed mats in the April 2 to May 15 period and during the summer months when it was working with only one barge and one tug (app. ex. D-16)

119.  Mr. Stynchcomb testified that there is nothing unique about the waves in Brevard County.  In response to a question from USACE counsel, he agreed that a 2.5-foot wave is the same regardless of whether it is in Brevard County or in south Florida. (Tr. 8/101)

USACE's Liquidated Damages Claim

120.  The contract incorporated FAR 52.211-12, LIQUIDATED DAMAGES – CONSTRUCTION (SEPT 2000).  The clause provided:

> (a) If the Contractor fails to complete the work within the time specified in the contract, the Contractor shall pay liquidated damages to the Government in the amount of

23

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

$1,230 for each calendar day of delay until the work is
completed or accepted.

(R4, tab 1 at 502).

121. The contract did not contain any provision listing the number of expected
adverse weather days per month. Instead, it contained a chart listing the average
number of days per month with rain greater than 0.1 inches:

| Gage Name | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Melbourne Intl Airport, FL | 4.2 | 4.5 | 4.5 | 3.5 | 4.7 | 9.2 | 8.7 | 10.4 | 9.3 | 6.8 | 4.1 | 3.6 |

(R4, tab 1 at 206)

122. COR Wilson testified credibly that mat placement would not be affected
by rainfall; it would be more affected by "oceanographic influences" (tr. 7/19). A light
rainfall might actually aid mat fabrication (*id.* at 20).

123. On February 16, 2023, CO Gonzalez-Aquino issued a final decision
assessing $249,690 in liquidated damages based on her finding that SFI did not
complete the contract until August 1, 2019 (R4, tab 58 at 4). She found that there were
42 excusable but non-compensable adverse weather days, which extended the contract
completion date to January 10, 2019. She assessed the liquidated damages based on
the 203 days from January 11, 2019 to August 1, 2019. (*Id.*)

124. CO Gonzalez-Aquino also issued Modification No. P00002 (Mod. P2)
which extended the contract completion date by the 42 excusable weather days (R4,
tab 57). The modification showed how she had calculated the number of days of
delay. She found that there was a total of 84 days in which the weather caused a
critical delay (37 in 2017 and 47 in 2018). She treated the chart showing the average
number of days of rain greater than 0.1 inches as days of adverse weather and
subtracted this from the number of weather delay days. For example, with respect to
September 2017, she found that there were 25 days in which the weather caused
critical day. She then subtracted the 9.3 days of rain greater than 0.1 inches (finding
121) to reach an excusable delay of 15.7 days, which she rounded up to 16 days. She
went through a similar exercise in all other months, finding that SFI was also entitled
to an extension of nine days in April 2018, nine days in May 2018, and eight days in
September 2018. (*Id.* at 2)

125. In its post-hearing brief, USACE explains the assessment of liquidated
damages through August 1, 2019, by pointing to its quality assurance report for that

24

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

date.  The report states that three SFI workers were at the site that day to install a buoy marker at mat set no. 2 (R4, tab 5 at 2437).

126.  SFI filed a timely appeal on May 12, 2023, that the Board docketed as No. 63616.

DECISION

ASBCA No. 62876

I.  Superior Knowledge

The superior knowledge at issue is Olsen 2007 (and, to a lesser extent, Bodge 2013), which, according to SFI, contained vital knowledge and should have been disclosed.  SFI does not contend that USACE should have given bidders the 1,449 pages of the Dally Data, and there is no evidence that the Dally Data would have been easier to review or provided superior data to that which was available from the NDBC buoys (finding 95).  SFI is relying solely upon Dr. Bodge's interpretation of the Dally Data, as well as his observations of the site and his opinions related to construction.

A.  Standards of Review

The superior knowledge doctrine "is generally applied to situations where:  (1) a contractor undertook to perform without vital knowledge of a fact that affects performance costs or duration; (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information; (3) any contract specification supplied misled the contractor or did not put it on notice to inquire; and (4) the government failed to provide the relevant information."  *Giesler v. United States*, 232 F.3d 864, 876 (Fed. Cir. 2000) (citing *Hercules Inc. v. United States*, 24 F.3d 188, 196 (Fed. Cir. 1994)).

"[A]s a general matter, the Government may be found in breach of a contract where it deliberately withholds information vital to the contract's performance, thereby misleading the contractor and causing him injury."  *Petrofsky v. United States*, 616 F.2d 494, 497 (Ct. Cl. 1980) (citing *Helene Curtis Indus., Inc. v. United States*, 312 F.2d 774, 777-78 (Ct. Cl. 1963)).  "The corollary to this rule is that the Government is under no duty to volunteer information which the contractor can reasonably be expected to seek out himself."  *Id.* (citing *H. N. Bailey & Assoc. v. United States*, 449 F.2d 376, 383 (Ct. Cl. 1971)).  The government is not obligated to volunteer facts that "could reasonably have been discovered through [the contractor's] own investigation and pursuit of leads given by the contract papers."  *Hunt & Willett, Inc. v. United States*, 351 F.2d 980, 985 (Ct. Cl. 1964).  The contractor cannot claim to be misled unless it reviewed the information to which it was directed by the contract.  *Id.* at 986 (contractor failed to investigate the site and failed to examine logs of drill

25

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

holes).  For example, in a case involving the manufacture of a steel shoe for armored personnel carriers, the Court of Claims held that the government was not liable because the information in question could have been obtained from "metallurgical literature."  *Firestone Tire & Rubber Co. v. United States*, 558 F.2d 577, 589 (Ct. Cl. 1977); *accord Giesler*, 232 F.2d at 877 (government not liable because the ingredients of a nut mix labeled "CID A-A-20164" were publicly available); *H.N. Bailey & Assoc. v. United States*, 449 F.2d 376, 382-83 (Ct. Cl. 1971) (information necessary for casting a manganese bronze alloy was obtainable from "textbooks and other scholarly works").

"A Government contractor, regardless of its size, locality or experience, is bound to understand the complexities and consequences of its undertaking."  *Tony Downs Foods Co. v. United States*, 530 F.2d 367, 374 (Ct. Cl. 1976).  Thus, the government does not have a duty to inquire into the knowledge of an experienced contractor.  *GAF Corp. v. United States*, 932 F.2d 947, 949 (Fed. Cir. 1991).  The government is not required to attach a warning to a solicitation that states "only knowledgeable and experienced contractors need apply."  *Am. Ship Bldg. Co. v. United States*, 654 F.2d 75, 79 (Ct. Cl. 1981).  It is "reasonable for the government to assume that a contractor is the best judge of its competency and will exercise good judgment in deciding to bid on a contract."  *Id.*

B.  USACE Generally Disclosed the Weather Conditions that Affected the Site

This is an appeal about weather that would occur up to about 26 months after USACE issued the solicitation (findings 1, 7, 26).  Weather that far into the future is not predictable with any certainty, although there may be general parameters of what can be expected.

The solicitation contained multiple warnings about the types of unfavorable site conditions that could be encountered.  It informed bidders that:  a) April is part of the inclement weather season; b) the project area is subject to tropical storms and hurricanes from June to November; and c) stormy, windy, and rainy weather, including dangerous thunderstorms, can occur at any time of year (findings 8-9).  USACE did not make any promises or representations that the seas would be calm or largely calm in the April 1st to October 1st timeframe.

The weather that SFI experienced was consistent with the warnings in the solicitation.  SFI lost almost all of September 2017 to three hurricanes, as well as part of September 2018 to another hurricane (findings 47-49, 61).  To the extent it was necessary to warn SFI, a Florida-based contractor, that September was in the hurricane season, USACE included this in the solicitation (finding 8).  *See Glasgow Assoc. v. United States*, 495 F.2d 765, 769 (Ct. Cl. 1974) (Air Force was not required to warn

26

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

bidders of the risk that interest rates might change because they would know such changes are always possible).

Similarly, SFI contends that it lost more than half of April 2018 to poor weather (finding 116). The solicitation informed bidders that April was an inclement weather month (finding 7). SFI can hardly claim to be surprised that there was some inclement weather in April. The Board also observes that, despite this warning, SFI was able to place mats in April 2018 but had to stop because it did not maintain adequate diver safety practices (finding 57)

The majority of the days that SFI claims as compensable delays relate to the hurricanes or April weather disclosed in the solicitation. The remaining weather days (and at least some of the lost productivity days) relate to more discrete weather events of unknown origin that resulted in waves/swells at the project site that fall under the solicitation's warning that the site is subject to stormy, windy, and rainy weather throughout the entire year. *See Hardeman-Monier-Hutcherson, J.V. v. United States*, 458 F.2d 1364, 1371 (Ct. Cl. 1972) (*Hardeman*) (observing that "it is difficult, if indeed not impossible, for us to separate the sea conditions from the weather.").

C. SFI's Bid Was Based on Errors in Judgment

The record demonstrates that SFI would have learned of the water visibility issues and the relative frequency of waves exceeding three feet if it had conducted a proper pre-bid site investigation. As we have found, SFI did not ask USACE or its subcontractors about water visibility conditions prior to bid (finding 24). Dr. Bodge's credible testimony convinced the Board that SFI's diving subcontractor would have known of the water visibility issues in Brevard County and, even if it did not, this information is readily available from those who worked in these waters (finding 75).

With respect to wave heights, SFI believed when it prepared its bid that it had the capability to place mats in seas up to four feet (finding 14). This proved to be a serious misjudgment. The record shows that SFI had little success in placing mats in seas more than 2.5 feet (finding 78). SFI also did not understand what would cause waves/swells at the project site, so it relied on wind data from the Florida mainland. SFI's overestimation of its mat placement capabilities and its use of wind data from the Florida mainland to calculate the number of weather days caused it to grossly underestimate the number of days in which the weather would prevent it from working. (Findings 13-17)

Wave height data was available for download from the NDBC website, among other sources (finding 18). SFI disregarded these sources, despite being directed to them in the solicitation, and instead relied on wind data from the Florida mainland (findings 13-14). While these buoys are outside the project site, the evidence has

27

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

convinced us that the buoys provide a reasonably accurate depiction of conditions at the project site (findings 66-67, 81-86). SFI acted unreasonably in failing to review this data and, instead, relying on wind speed data from the mainland.

In its reply brief, SFI invites the Board to disregard the buoy data and rely upon what SFI characterizes as testimony that conditions at the site were worse than at the buoys (app. reply at 15). We decline this invitation because the witness to whom SFI refers, Superintendent Daher, never saw conditions at the buoys (finding 80).

This leaves SFI in the difficult position of trying to justify its failure to rely on the buoy data at the time of bid (finding 13) while at the same time basing its claim on the very same buoys (findings 83-84). The only plausible argument SFI makes to reconcile these positions comes from its expert, Mr. Stynchcomb. He contended that downloading and analyzing the buoy data would have been too much work for a contractor to do in the limited time it had to prepare the bid (tr. 8/106, 114). He testified that it took him two to three days to perform this task (finding 84). The Board does not view two to three days as unreasonable because SFI had more than six weeks to prepare its bid (finding 1). Moreover, even if this was beyond SFI's capabilities, there were numerous coastal engineers it could have retained to perform the task (finding 18).

Finally, SFI compounded these errors by selecting an anchor barge, which it had never used before. This barge floated on the water and likely exacerbated water visibility issues. SFI should have used a jack-up barge, which would have isolated the barge from the movement of the waves. (Findings 31-34)

D. USACE Was Not Obligated to Provide the Bodge Documents to Bidders

According to SFI, Olsen 2007 contained four categories of vital information: 1) the statement that 2 feet was "a reasonable proxy for the maximum swell" a contractor would schedule vessel operations in the Mid-Reach, with work in 3-foot seas being "mostly infeasible"; 2) Dr. Bodge's "synthesis of the wave climate" using the Dally Data; 3) his categorization of the construction season as being "pragmatically limited" to the mid-May to mid-September period; and 4) his description of the water as having "chronically limited, near-zero underwater visibility (app. br. at PFOF 53, and p. 72).

Our findings have addressed much of this. The visibility of the water was well known, as were general weather and sea condition trends in the area, and SFI would have discovered this pre-bid if it had made reasonable inquiries (findings 6, 75, 97). Similarly, wave information for 2016 and prior years was available from the NDBC buoys and other sources to the north, east, and south of the project site (findings 18-

28

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

20). SFI has not shown that the Dally Data provides information about the site conditions that was not available from the NDBC buoys (finding 95).

However, Dr. Bodge's statement that 2 feet was a "reasonable proxy" for the maximum swell in which a contractor would schedule work and that work in 3-foot seas was "mostly infeasible" is another matter. The prediction that working in 3-foot seas would be mostly infeasible was consistent with SFI's experience, and we understand why SFI relies on it. However, there are several problems with SFI's reliance.

Dr. Bodge's intent when he wrote the report was to explain to the regulatory agencies why it was not safe or feasible to work in the very shallow waters within 400 feet of shore at a maximum depth of -4 feet, mean low water (findings 92, 102). Dr. Bodge never stated in his report that working in 3-foot seas was infeasible if the contractor was working in -14 to -16 feet, mean low water. His report contains no analysis of equipment choices, other than a single sentence in which he implied that a jack-up barge would alleviate some of the problems discussed in the report (finding 104). He testified credibly at the hearing that equipment choice would be "fundamentally important" (finding 104). Accordingly, because Olsen 2007 did not address the actual project to be built, it risked misleading or confusing contractors. *See Am. Ship Bldg.*, 654 F.2d at 79 ("[i]t would be irresponsible procurement to seek to deter bidders from bidding, or even seem to do so").

Second, Dr. Bodge, who was a percipient witness, did not work for USACE, and there is no evidence that USACE shared the opinions that contractors would be unwilling to work in seas greater than 3 feet or that they would be able to work only from May 15 to September 15. Testimony at the hearing showed that USACE believed that a contractor could work at higher wave levels with proper equipment and could possibly work year-round (finding 32).

Third, even if USACE agreed with Dr. Bodge, Dr. Bodge was merely offering his opinion on the maximum swells in which a contractor could work and the length of the placement season (if it were placing mats in very shallow water). The first prong of the superior knowledge test speaks of the contractor performing "without vital knowledge of a fact that affects performance. . ." *Giesler*, 232 F.3d at 876 (emphasis added). Opinions are not facts, and both the Board and the Court of Federal Claims have held that undisclosed opinions are not superior knowledge. *ACC Constr. Co., Inc.*, ASBCA Nos. 62265, 62937, 22-1 BCA ¶ 38,194 at 185,481 *aff'd* 2024 WL 2064620 (Fed. Cir. 2024). As the Court of Federal Claims explained in *Northrop Grumman Corp. v. United States*, 47 Fed. Cl. 20, 90 (2000), a technical judgment or prediction made by the government is "not a 'fact' that affected performance cost or duration."

29

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Finally, to the extent that SFI relies on Bodge 2013, this document contains a less than one-page estimate that Dr. Bodge described at the hearing as "spitballing ideas" (finding 109). The Board determines that this rough estimate was not well thought out and was not vital knowledge that USACE was obligated to provide to bidders.

### E. *Hardeman-Monier-Hutcherson* and *H&L Contracting* Do Not Compel a Different Result

In *SFI II*, the Board denied the government's summary judgment motion with respect to superior knowledge based on the Court of Claims' decision in *Hardeman*. *SFI II*, 24-1 BCA at 187,679. There are some similarities between that case and the present appeal: both involved sea conditions that were more difficult than expected, and the agency had information about those conditions that it did not disclose. After further development of the record in this appeal, the Board concludes that the similarities end there.

The *Hardeman* contract involved a project to construct a pier in a remote, uninhabited area of Australia, 850 miles from Perth, in the 1960s. *Hardeman*, 458 F.2d at 1365. The government commissioned two site investigations to decide upon the location and design of the pier. The first investigation was cut short after the vessel captain concluded that no one would build a pier at the location due to the severe weather and sea conditions. The second investigation also encountered bad weather and rough seas. *Id.* at 1365-66. The plaintiff made a concerted effort to research the site conditions but found only limited information. *Id.* at 1367, 1369. It requested the reports commissioned by the government, but the government refused to provide them. *Id.* at 1367. The solicitation warned bidders about winds and cyclones but also stated that clear weather could be expected over large portions of the year. *Id.* at 1366-67.

This appeal is far different. As we have already explained at length, the site at issue is just off the coast of Florida where there was abundant data available for download from the internet. SFI simply failed to do an adequate site investigation. Moreover, the Olsen 2007 report prepared for regulators to address why the mats should not be placed in very shallow water (different from the depths required by the contract) does not compare to the reports in *Hardeman*, which were directly on point to the project and were the only meaningful source of data. *Id.* at 1369.

Finally, the Board's recent decision in *H&L Contracting LLC*, ASBCA No. 63695, 25-1 BCA ¶ 38,896 also does not help SFI. *H&L Contracting* involved a USACE contract to dredge a harbor. Unlike here, USACE's solicitation made specific representations about the sea conditions at the project site, including wave heights, that the Board found to be misleading. *Id.* at 189,346-47. USACE had dredged the same

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

harbor 12 years earlier in 2010 and had included in that solicitation more information and warnings about the severe sea swells that could be expected and dictated minimal equipment requirements to deal with the conditions. Instead of including the same information, warnings and requirements in the subsequent solicitation, USACE based its description of sea conditions on those in a different harbor five miles up the coast, where the dredging contractor had successfully used equipment less robust than USACE had previously deemed necessary for the harbor at issue. *Id.* at 189,336-37.

In addition, USACE possessed, but did not disclose, specific factual information about the wave conditions at the project site that the Board found would have prevented the contractor from selecting inadequate equipment for the job. *Id.* at 189,337-39, 344-46. The Board emphasized that the contractor's bid was reasonable in light of the fact that the solicitation's representations led USACE's own internal estimating team to reach the same faulty conclusions about the sea conditions as the contractor had. *Id.* at 189,344-47. The contractor, however, encountered conditions similar to those described in the 2010 solicitation and in the undisclosed information and, as a result, incurred increased costs. *Id.* at 189,342-43. The Board held the agency liable for withholding superior knowledge.

*H&L Contracting* is not comparable to this appeal. The solicitation here did not contain misleading misrepresentations as to the wave conditions SFI could expect, and there was no prior contract at the site from which USACE could incorporate a description of the sea conditions. While USACE did have Olsen 2007, that document addresses placement of mats in very shallow water, which was not the goal of the contract awarded to SFI. Unlike the undisclosed information in *H&L Contracting*, nothing in Olsen 2007 or Bodge 2013 rendered the information in the solicitation misleading to SFI.

For all of the foregoing reasons, SFI's superior knowledge claim is denied.

II.  Constructive Acceleration

In the alternative, SFI contends that it is entitled to recover under a constructive acceleration theory. To recover for such a claim, the Federal Circuit has held that the contractor must prove that: (1) the contractor encountered a delay that is excusable under the contract; (2) the contractor made a timely and sufficient request for an extension of the contract schedule; (3) the government denied the contractor's request for an extension or failed to act on it within a reasonable time; (4) the government insisted on completion of the contract within a period shorter than the period to which the contractor would be entitled by taking into account the period of excusable delay, after which the contractor notified the government that it regarded the alleged order to accelerate as a constructive change in the contract; and (5) the contractor was required

31

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

to expend extra resources to compensate for the lost time and remain on schedule. *Zafer Taahhut Insaat v. Ticaret A.S.*, 833 F.3d 1356, 1362 (Fed. Cir. 2016).

To establish excusable delay, a contractor "must show that the delay resulted from 'unforeseeable causes beyond the control and without the fault or negligence of the Contractor.'" *Sauer Inc. v. Danzig*, 224 F.3d 1340, 1345 (Fed. Cir. 2000) (quoting 48 C.F.R. § 52.249–10(b)(1)).

SFI's claim stems from ACO Cotter's March 5, 2018 letter in which he stated that SFI was approximately 225 days behind schedule and demanded a recovery schedule, while acknowledging that there had been some excusable delays, that is, "several tropical storms" in September 2017 (finding 55).

ACO Cotter's actions were consistent with contract section 01 32 01, paragraph 3.9, Failure to Achieve Progress. This clause allowed the CO, if he concluded that the contractor was behind schedule, to "require provision of a written recovery plan" that "detail[ed] how progress will be made-up to include which activities will be accelerated by adding additional crews, longer work hours, extra work days, etc." (finding 54).

SFI cannot prove a constructive acceleration claim because the vast majority of the delays as of March 5, 2018, had been caused by SFI and were not excusable. When ACO Cotter wrote the March 5 letter, he knew that he had spent a significant amount of time in the spring of 2017 urging SFI to begin mat placement and inspecting SFI's preparations, only to find that SFI had not been candid about its readiness (findings 37-38). He also knew that SFI had done almost nothing in terms of mat placement prior to July 11, 2017, more than halfway through the season (finding 41-43). As discussed above, SFI's slow progress in 2017 was caused by its use of a single anchor barge and a single diver, its failure to consistently work on weekends, and its mistaken belief that it could place mats in seas up to 4 feet, among other things (findings 32, 52-53, 56, 58, 78).

While it is true that USACE later agreed that there were 37 weather days in 2017 (finding 124), a more realistic bid than SFI's would have anticipated many of these days (finding 87). In any event, SFI had not requested a time extension as of March 5, 2018, and did not do so until after the 2018 season (finding 49). Because SFI failed to request a time extension prior to the 2018 season, it also did not advise USACE that its failure to issue the time extension was tantamount to an order to accelerate.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Accordingly, SFI cannot meet the first four elements of a constructive acceleration claim.

III.  Breach of the Duty of Good Faith and Fair Dealing

SFI contends that USACE breached the duty of good faith and fair dealing by not providing SFI with Olsen 2007 and Bodge 2013 and by not rejecting SFI's initial schedule and work plan.  SFI also contends that it is entitled to compensation under the Changes clause "given the divergence of the 'estimate, or general guideline' provided by USACE from actual conditions" (app. br. at 89).

As the Federal Circuit explained in *Scott Timber Co. v. United States*, 692 F.3d 1365, 1372 (Fed. Cir. 2012), USACE could not have breached the duty of good faith and fair dealing by not providing bidders with the Bodge documents because the duty does not exist until the contract is signed.

As for the alleged duty to reject SFI's schedule and work plan, USACE raised concerns about whether SFI had accounted for weather in its schedule, to which SFI responded that it had considered the weather and planned to work a six-day week, and could work a seventh day if necessary.  This turned out not to be entirely true. (Findings 36, 42, 52)  But in May 2017, USACE was unaware of how inept SFI would be at placing mats in 2017 and did not know that three hurricanes would impact the site in September 2017.  Under the circumstances, USACE acted within its discretion in accepting SFI's assurances and in not rejecting the schedule.

Finally, with respect to SFI's theory based on the Changes clause, weather conditions historically have been viewed as acts of God for which the contractor is not entitled to increased costs.  The Changes clause does not shift the risk of adverse weather to the government.  *Turnkey Enters., Inc. v. United States*, 220 Ct. Cl. 179, 186-87 (1979).  The Board sees no reason to depart from that rule in this appeal.

ASBCA No. 63616

The assessment of liquidated damages is an affirmative government claim for which the government bears the burden of proving that the contractor failed to complete the project on time.  Liquidated damages cannot be assessed on a construction contract after the date the project is substantially completed.  Whether the contract is substantially complete is a factual determination made by the Board after considering the quantity of work remaining to be done and the extent to which the project was capable of serving its intended purpose.  *Amigo Bldg. Corp.*, ASBCA No. 54329, 05-2 BCA ¶ 33,047 at 163,823.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

USACE has clearly met its burden of proving that SFI did not complete the contract on time.  The pertinent questions, in our view, are the date that SFI achieved substantial completion and whether the time extension in Mod. P2 was calculated and applied correctly.

SFI's affirmative claim was the primary focus of the eight-day hearing, not USACE's liquidated damages claim.  Based on the evidence that the Board heard, the purpose of the project was to allow Brevard County to replenish the sand on its beaches, the price for which was the construction of an artificial reef (findings 89-90).  USACE's own evidence showed that SFI completed construction of the artificial reef by placing the last mat on June 22, 2019 (finding 64).  Neither party addressed through testimony the buoy marker installed by SFI on August 1, 2025, but, as far as we can tell, this was a minor shortcoming that did not prevent the project from serving its intended purpose.  The Board finds that SFI achieved substantial completion on June 22, 2019.

Next, we consider whether the CO properly calculated the time extension to which SFI was entitled and whether she applied the extension correctly.  With respect to the former question, the Board holds that the CO did not calculate the extension correctly.  The CO determined that there were 84 weather days from which she subtracted 42 adverse weather days that she believed were in the contract, for a net 42-day time extension (finding 124).  However, the contract did not contain a clause listing an expected number of adverse weather days.  It contained a clause listing only days with at least 0.1 inches of rain, information that was not particularly notable because a light rain might actually have been helpful to SFI (findings 121-22).  The clause containing the expected number of days with rain of at least 0.1 inch cannot be treated as an adverse weather day clause.  Accordingly, we conclude that SFI is entitled to a full 84-day extension.

The more difficult question is determining the period to which the extension should be applied.  The CO started the time extension on the contract completion date, resulting in an extension to January 10, 2019 (finding 123).  Adding another 42 days to this would result in a completion date of February 21, 2019.  However, under these circumstances, where the record suggests that winter is mostly unsuitable for construction (findings 5-6), the Board does not believe that it would be reasonable to require a contractor to attempt to place mats in the December through February time period.

It is more reasonable in our view to apply the time extension to the placement season identified in the contract, which starts on April 1 (finding 7).  84 days starting from April 1, 2019, is June 23, 2019.  Because SFI achieved substantial completion one day earlier on June 22, 2019, no liquidated damages are due.

34

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

<u>CONCLUSION</u>

ASBCA No. 62876 is denied.  ASBCA No. 63616 is sustained.

Dated:  April 6, 2026

_____
MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

_____
OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I <u>concur</u>

_____
THOMAS P. MCLISH
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 62876, 63616, Appeals of Shoreline Foundation, Inc., rendered in conformance with the Board's Charter.

Dated:

_____
PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

35